CENTER FOR BIOLOGICAL DIVERSITY et al., Plaintiffs,

v.

WILDLIFE SERVICES, Animal and Plant Inspection Service, United States Department of Agriculture, Defendants.

No. CV 07–629 TUC JMR.

United States District Court, D. Arizona.

Aug. 11, 2009.

Matthew Gilbert Kenna, Western Environmental Law Ctr., Durango, CO, for Plaintiffs.

J. Cole Hernandez, U.S. Attorney's Office, Tucson, AZ, for Defendants.

### ORDER

JOHN M. ROLL, Chief District Judge.

In these cross-motions for summary judgment currently pending before the

Court, Plaintiffs seek information relating to a records request under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552(b), while Defendants argue that releasing such information would violate the privacy of various individuals. For the reasons stated below, Defendants' Motion for Summary Judgment (Doc. No. 13) is **DENIED,** and Plaintiffs' Motion for Summary Judgment (Doc. No. 15) is **GRANTED.**

## I. Background

The instant case stems from the efforts of Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and the Sierra Club [hereinafter "Conservation Groups"] to "protect and restore Mexican wolf populations in the Southwest," due to their concern that "[d]epredation-related removals of Mexican wolves by the USFWS and Wildlife Services are the largest factor limiting population growth." (Statement of Facts in Opp. to Defs.' Mot. for S.J. & in Support of Pls.' Mot. for S.J. at Ex. A ¶ 3.) Wildlife Services [hereinafter "WS"] is a program within the Animal and Plant Health Inspection Service [hereinafter "APHIS"] of the United States Department of Agriculture [hereinafter "USDA"] that "cooperates with states, counties, Tribal authorities, local communities, and agricultural producers to reduce crop and livestock depredations caused by birds, rodents and predators, including the Mexican wolf." (Defs.' Motion for S.J. at 2.) Prior to conducting such "wildlife damage control activities" on individuals' property, WS enters into Cooperative Service Agreements with these individuals, and "[n]eighboring landowners may also enter into a Cooperative Service Agreement to allow WS access to their land to aid another person who has requested the assistance." (Defs.' Motion for S.J. at 2.) Those who enter into the Cooperative Service Agreements are known as "cooperators." (Defs.' Mot. for S.J. at 2.)

Plaintiffs express concern that the Mexican wolf is severely endangered, since, for example, in 2007, "19 Mexican wolves were removed from the wild for depredations, leaving a year end wild population of just 52 wolves and 3 breeding pairs anywhere in the world." (Pls.' Statement of Facts in Opp. to Defs.' Mot. for S.J. & in Support of Pls.' Mot. for S.J. Ex. A ¶ 3.) Thus, on August 30, 2006, Plaintiffs submitted a request for records to the Animal and Plant Health Inspection Service's ("APHIS") FOIA Officer. That request sought the following information:

(a) All records relating to the capture of Mexican wolves since the inception of the reintroduction program in March of 1998. This includes records that document the need to capture wolves, the agent of capture, protocols used, and records related to post capture husbandry. Additionally, for all animals that have died as a result of capture, either from the use of lethal force or subsequent to capture, all necropsies, and histopathologic, hematologic, and serologic test results. Also provide all requests for control of free-ranging wolves and documents showing whether the request for control was legitimate and the action was warranted.

(b) All records, including depredation reports, reports of field and clinic-based necropsies, and other examinations such as histopathologic, hematologic, and serologic test results of livestock purported to be killed or injured by Mexican wolves, and any other documents or information relative to the determination that wolves were involved, in all cases in which this determination counted as a "strike" against a wolf or wolf pack, as defined in the Mexican Wolf Adaptive Management Oversight Committee's SOP 13.0. Also sought were the same records and information, for any case in which the same determination was made

and resulted in a control action prior to the adoption of SOP 13.0.

(Defs.' Statement of Facts in Support of Mot. for S.J. at 2.) Plaintiffs allege that their FOIA request was an "attempt to answer several questions," including

First, are these [wolf] removals legitimate? In other words, do they follow the rules set out in Standard Operating Procedure 13.0? (Standard Operating Procedure 13.0 is a set of procedures governing when and how "nuisance" and depredating wolves may be managed or removed). How are depredations assigned to particular wolves or packs? Are such assignments reasonable, or arbitrary? Is the evidence for wolf-caused depredation compelling and objective? Second: Where and when are depredations and removals occurring? Are there patterns which suggest a remedy for excessive depredations, such as setting up special fencing or supporting herders/riders, or voluntary retirement of particular areas from grazing? All of this information aims to inform the public, through Defenders of Wildlife's publications, email alerts, and educational outreach, about the weaknesses of the program and ways that it might be improved, to the benefit of wolves, wolf supporters, and the ranchers who are directly impacted by wolves.

(Pls.' Statement of Facts in Opp. to Defs.' Mot. for S.J. & in Support of Pls.' Mot. for S.J. Ex. A ¶ 3.)

APHIS subsequently complied with these requests for records. However, some of the pages were redacted, due to APHIS's belief that certain information in the records should be withheld due to certain exemptions provided by the FOIA. (Defs.' Statement of Facts in Support of Mot. for S.J. at 4.) Defendants claim that "[a]ll redactions made ... were made to protect the privacy of individuals." (Defs.'

Statement of Facts in Support of Mot. for S.J. at 5.)

At the beginning of this litigation, Plaintiffs' request for release of previously-redacted information was broader, but the parties have since worked together to narrow the dispute. Therefore, the only data currently in dispute are "the GPS coordinates in the form of longitude/latitude coordinates or an alternative method, Universal Transverse Mercator (UTM coordinates) [hereinafter 'GPS coordinates']." (Reply in Support of Mot. for S.J. & Opp. to Pls.' Cross Mot. for S.J. at 2.) The GPS coordinates would identify the locations of previous wolf depredations. Plaintiffs claim they need this information, declaring that

[p]roviding specificity only to the level of city and state does not allow us to understand where a depredation or removal occurred. Many of the "ranches" in question are in fact vast tracts of public land (tens of thousands of acres) tied to a single address. We cannot correlate 'city and state' information to the locations of particular packs of wolves in order to assess the likelihood that a particular pack committed a depredation, nor can we identify 'hot spots' for depredation or removals which may suggest remedies. In order to do this, we need information withheld under exemption 6; specifically, a UTM (satellite location data) for a depredation, which Wildlife Services routinely notes on depredation reports. We do not need the names of ranch owners and employees.

(Statement of Facts in Opp. to Defs.' Mot. for S.J. & in Support of Pls.' Mot. for S.J. at Ex. A ¶ 4.) Defendants, however, argue that the GPS coordinates are properly withheld pursuant to Exemptions 6 and 3 of the FOIA.

## II. Analysis

### A) Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has met the initial burden, however, the opposing party bears the burden to demonstrate, by the production of probative evidence, that an issue of fact remains. *Id.* In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party. *King County v. Rasmussen*, 299 F.3d 1077, 1083 (9th Cir. 2002). The nonmoving party, however, may not "rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R.Civ.P. 56(e). If significant factual issues remain, the motion should be denied. *U.S. v. Carter*, 906 F.2d 1375, 1377 (9th Cir. 1990).

The standard of review in FOIA actions is mandated by 5 U.S.C. § 552(a)(4), which states:

> On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter *de novo,* and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and *the burden is on the agency to sustain its action.*

5 U.S.C. § 552(a)(4) (emphasis added).

### B) FOIA Analysis

The FOIA mandates that federal agencies must make agency records available to any person who requests them, except in those instances in which one or more of nine categories of exempt documents applies. 5 U.S.C. § 552(a)(3)(A) states in pertinent part that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." The nine categories of documents that are exempt are listed in 5 U.S.C. § 552(b). Defendants claim that two of the nine exemptions, Exemptions 3 and 6, apply in this case.

#### *Exemption 6:*

Matters are exempt from FOIA that are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) [hereinafter "Exemption 6".]

Exemption 6 exempts matters from disclosure only when disclosure would constitute a *"clearly unwarranted* invasion of personal privacy." *Id.* (emphasis added). The phrase "clearly unwarranted" "instructs [a court] to 'tilt the balance (of disclosure interests against privacy interests) in favor of disclosure.'" *Washington Post Co. v. United States Dep't of Health and Human Servs.,* 690 F.2d 252, 261 (D.C.Cir.1982) ("Washington Post I") (citations omitted). The "presumption in favor of disclosure [under Exemption 6] is as

strong as can be found anywhere in the Act." *Id.* In a recent case in the United States Court of Appeals for the District of Columbia Circuit, the Court described the inquiry under Exemption 6 as follows:

First, we must determine whether the [records requested] are personnel, medical, or "similar" files covered by Exemption 6. If so, we must then determine whether their disclosure "would constitute a clearly unwarranted invasion of personal privacy." This second inquiry requires us to balance the privacy interest that would be compromised by disclosure against any public interest in the requested information.

*Multi Ag Media LLC v. Dept. of Agriculture,* 515 F.3d 1224, 1228 (D.C.Cir.2008) (citations omitted). The phrase "personnel and medical and similar files" has been interpreted broadly to include many different types of records. *See Forest Service Employees for Environmental Ethics v. United States Forest Service,* 524 F.3d 1021, 1024 (9th Cir.2008). Both sides agree that the records requested are "personnel, medical, or 'similar' files" covered by Exemption 6, so the sole inquiry that remains is whether or not the release of the information regarding the GPS coordinates constitutes an invasion of personal privacy that outweighs the public interest in the information.

Courts have mandated that government agencies release even such private information as the names and addresses of individuals in response to FOIA requests. *See, e.g., Oregon Natural Desert Ass'n v. United States Dep't of the Interior,* 24 F.Supp.2d 1088, 1093 (D.Or.1998) (Bureau of Land Management required to release the names of individuals who had allowed their cattle to illegally trespass on land); *Washington Post Co. v. United States Dep't of Agric.,* 943 F.Supp. 31, 35 (D.D.C. 1996) (*"Washington Post II"*) (FOIA required the release of names and addresses of persons receiving a federal farm subsidy). In *Washington Post II,* the Court acknowledges that the Supreme Court has "rejected the position that 'disclosure of a list of names and other identifying information is inherently and always a significant threat to the privacy of the individuals on the list,'" and notes that "whether disclosure of a list of names is a 'significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.'" *Id.* at 34 (quoting *Department of State v. Ray,* 502 U.S. 164, 176 n. 12, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991)). In concluding that the list of names and addresses of recipients of a federal farm subsidy should be released, the Court reasoned:

The "defining characteristic" of the list sought ... is that it contains business addresses. The individuals on this particular list are there because they are cotton farmers and businesspeople who have sought and received government subsidies in their business capacities. While their business addresses might in many instances be the same as their home addresses, the farmers whose names and addresses are on the list did not get subsidies because they live on a farm but because they work on one.

*Washington Post II,* 943 F.Supp. at 35–36 (citations omitted).

Similarly, in *National Association of Home Builders v. Norton,* 309 F.3d 26 (D.C.Cir.2002), the Court ordered the U.S. Fish and Wildlife Service to disclose the specific location of endangered owls, despite the fact that in some cases that would mean revealing the addresses of the owners of the land on which the owls were located. The Court stated that "[b]ecause disclosure of site-specific information about the pygmy owls could contribute 'to public understanding of the operations or activities of the government,' it constitutes a

cognizable public interest under FOIA." *Id.* at 36 (citations omitted).

Defendants cite one Ninth Circuit case, *Minnis v. United States Department of Agriculture*, 737 F.2d 784, 785 (9th Cir. 1984), in support of their position that they are justified in withholding the GPS coordinates. However, *Minnis* is entirely distinguishable. In *Minnis*, the plaintiff owned a commercial lodge on the bank of the Rogue River in Oregon, and filed a FOIA request to compel the Forest Service to reveal the names and addresses of all persons who had applied for permits to travel on the Rogue River during the 1983 regulated season. *Id.* at 785. In rejecting the plaintiff's request for the names and addresses, the Court concluded that Minnis's "principal interest in obtaining the permit applicant list [wa]s purely commercial in character," since "[Minnis] want[ed] to advertise his lodge to people who are interested in visiting the Rogue River." *Id.* at 786. The Court stated that "FOIA was not intended to require release of otherwise private information to one who intends to use it solely for personal gain." *Id.* at 787.

▮ In contrast to *Minnis*, Plaintiffs here do not seek the specific names and addresses of the owners of ranches and property on which wolf depredations occurred. They simply seek the GPS coordinates to locate where the incidents occurred, for their stated purpose of improving the wolf recovery program. Also, Plaintiffs' request for the GPS information cannot be said to be purely commercial in character, nor do they request the information solely for personal gain, as did the *Minnis* plaintiff, who

wanted to advertise his lodge. The information requested in this case is quite similar to that requested in *National Association of Home Builders*, particularly in light of the public interest in determining the manner in which the government is managing the wolf control program.

Defendants argue that release of the GPS coordinates could "readily reveal the identity of ranch owners because public records, in conjunction with the GPS coordinates, would reveal the exact location of the attack and the owner of the animal." Defendants further argue that "there is a history of violent acts against government employees and facilities relating to wildlife programs," including a 2004 incident in which WS staff members were "subjected to threats in Tucson, Arizona relating to their participation in a mountain lion program, and program equipment was stolen." (Defs.' Mot. for S.J. at 3.) However, as Plaintiffs argue, "[n]one of the ... past irresponsible acts of program opponents were against private parties involved in Wildlife Services programs, and Wildlife Services has not even identified any acts against government employees involved in Mexican wolf removals, even though the employees are well known." (Pls.' Reply in Support of Mot. for S.J. at 5.) [1]

The GPS coordinates may not be withheld as exempt pursuant to Exemption 6.

### Exemption 3

Matters are exempt from FOIA that are "specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from

---

1. Thus, the instant case is also readily distinguishable from *Judicial Watch v. FDA*, 449 F.3d 141, 153 (D.C.Cir.2006), in which the Court forbade the release of the names and addresses of persons who had developed an abortion-inducing drug. In *Judicial Watch*, there was a specific "danger of abortion-related violence," including "websites that encourage[d] readers to look for mifepristone's manufacturing locations and then kill or kidnap employees once found." *Id.* That type of danger is simply not presented here.

the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3) [hereinafter "Exemption 3".]

█ Defendants argue in their Response/Reply brief (but not in their opening brief) that Exemption 3 also applies to the GPS coordinates, in addition to Exemption 6. They argue that Section 1619 of the Food, Conservation, and Energy Act of 2008, which prohibits disclosure of "geospatial information otherwise maintained by the Secretary about agricultural land or operations" falls into Exemption 3's protection. However, absent Congress' "express command," statutes are only to be applied prospectively. *Martin v. Hadix,* 527 U.S. 343, 345, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999). Here, Wildlife Services responded to the Conservation Groups' requests for records before the FCEA's effective date of May 22, 2008. *See* Pls.' Reply in Support of Mot. for S.J. at 7 (citing Pub. L. 110–246 § 4). Thus, because the statute cited here by Defendants—section 1619 of the FCEA—cannot be applied retroactively to cover the conduct at issue in the instant case, the GPS coordinates may not be withheld as exempt pursuant to Exemption 3.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 13) is **DENIED,** and Plaintiffs' Motion for Summary Judgment (Doc. No. 15) is **GRANTED.**

The Clerk of Court is directed to enter judgment accordingly and close this case.